**TEXAS EMPLOYERS' INS. ASS'N v. PHILLIPS et al.**

No. 2723.

Court of Civil Appeals of Texas. Beaumont.

Nov. 4, 1937.

Rehearing Denied Nov. 10, 1937.

Lawther & Cramer, of Dallas, and Seale & Thompson, of Nacogdoches, for plaintiffs in error.

Adams & McAlister, of Nacogdoches, for defendants in error.

WALKER, Chief Justice.

The nature of this suit was fully stated by the Commission of Appeals in its opinion, Texas Employers Insurance Association v. Mrs. Kate Phillips et al., 107 S.W. (2d) 991, answering a certificate from this court. On the answers to our certificate, appellees can recover only for 102 weeks at $10.90 per week, running from the date of Jim Phillips' injury, 10th day of October, 1930, to his death on the 30th day of Septemeber, 1932, with interest at 6 per cent. per annum from the respective maturity dates of the weekly payments.

The Commission of Appeals referred to the Thibodeaux Case (Texas Indemnity Ins. Co. v. Thibodeaux) (Tex.Com. App.) 106 S.W.(2d) 268, for its answer to our third question; an affirmative answer to that question would operate to reverse the judgment of the lower court only in the event that "partial disability" was raised by the evidence. Traders & General Insurance Company v. Babb (Tex. Civ.App.) 83 S.W.(2d) 778; Traders & General Insurance Company v. Shanks (Tex.Civ.App.) 83 S.W.(2d) 781; Southern Underwriters v. Stubblefield (Tex.Civ. App.) 108 S.W.(2d) 557; Federal Underwriters Exchange v. J. L. Wheeler (Tex. Civ.App.) 108 S.W.(2d) 922.

In the entire statement of facts there is not one scintilla of evidence raising the issue of partial disability. On that issue, appellees offered 18 witnesses—some of them were related to the deceased but most of them were neighbors and friends who had known him for many years. Under all this testimony, Jim Phillips was an able-bodied man prior to his injury on the 10th day of October, 1930; after his injury he was not physically able to do even one day's work. These witnesses saw him many times from the date of his injury to the date of his death and could not have been mistaken as to his physical condition. We give the testimony of two doctors offered by appellees. Dr. George H. Turner, a graduate in medicine who had practiced his profession for more than 42 years, testified:

"Q. Were you, in 1930, doing the medical work for the Garrison Brick and Tile Company? A. I did not do it all myself, but I worked for them from time to time.

"Q. During that time, in October some time, were you called on to treat Jim Phillips—asked to treat him? A. Yes, sir. He called at my office; they brought him to my office—Mr. Weatherford did.

"Q. Do you remember the date? A. I think it was either the 10th or 11th or 12th; I would not be positive.

"Q. Now, tell the first time you saw him, and how you treated him; what you found from your diagnosis, and how you treated him; I just want in your own words to give to the jury, and what was the result? A. It was either the 10th or the 11th he came to my office complaining of his hip hurting him. I did not make any real close examination of the fellow; we have so many of them come in if they get bruised, and I suggested liniment. I told him to make a local application of that and the chances are it would help him; and about the third day, as well as I recall, he came back again and said it was hurting him, and I carried him in my office and examined him in the office. I stripped him off and made a thorough physical examination, and I found his hip muscles tender; that is, he said they were tender; that is a symptom and evidence as to tenderness that I had to take his word, but his muscles were swollen, and I began a muscular treatment, as well as I recall, with a normal salt solution, with a needle about three inches long, up as close as I could where he complained he was injured; and I kept that up and he did not get any better, and I changed my treatment to sodium iodide. I think all of this treatment possibly was changed after I sent him up to Dr. Tucker. He was not getting along as well as I would have liked for him to get along, and I suggested that he see another doctor, and I sent him to Dr. Tucker, and he came down, and Dr. Tucker wrote me that he would continue that treatment—that he thought that treatment was about as good as he could do, and suggested that we keep the treatment up a while, and I treated him a while longer, and he didn't get any better, and I suggested that he come to Dr. Nelson and have a picture made of his hip and see if it revealed anything there that would help us out as far as the treatment was concerned; and Dr. Nelson sent him back and told him that he was on about as good a treatment as he thought he could be on, and I treated him a while longer; and then I put him on another—a deep intra-muscular injection of oil of camphor, and treated him I suppose for two or three months—I don't know exactly the date—and he didn't get any better, and I told him, 'Jim, I have done all for you that I can; you had better see some one else. I don't know anything further that can be done for you.'

"Q. What did you mean by that—by what you told him—that you had done all you could for him? A. Well, I had just went my limit. My medical skill could not show me a treatment that would justify me in giving any further treatment, when I didn't get any result.

"Q. In other words, you had done all you could do? A. Yes, sir.

"Q. His injury would be, what you call it? Produce what you men call when you get when you get hurt, or make a bruise or something—traumatic? A. Trauma—a bruise is a trauma.

"Q. You examined him in the region of his hip? A. Yes, sir.

"Q. Had you known him before you examined him? A. I had known him for thirty-five years.

"Q. Did you ever know him to have a limp at any time? A. I did not.

"Q. After viewing him as you did, treating him and telling him that you had done all you could over that period of time, what would you say as to his injury being permanent and total? A. The way I would class his as being totally disabled, according to his work.

"Q. He had been a man that had done all heavy work; could he, after that injury, continue to do that work? A. No, sir; he could not.

"Q. What would be the result of this injury in there on his person, as to whether shifting from one side to another would have a tendency to relieve it as Jim would do that? A. Every time he would move it would make pressure on that muscle and it would hurt him.

"Q. But what is the result in sitting in one place and those things? For instance, you take this sitting here, now, that Jim would move about and change in his chair; what would be the cause of that? A. Well, it would be an impingement, I suppose you would call that, tech-

nically; a pinching of that nerve is what it means.

"Q. An impingement means a pinching of the nerve? A. Yes, sir.

"Q. Moving about, would that have a tendency to relieve that pressure? A. Yes, sir.

"Q. If he had that since, what would be the probability or likelihood of his recovery over a period, or would it be lasting? A. Lasting."

Dr. W. H. Faulkner, a graduate in medicine with 32 years' experience, testified:

"Q. Did you know Jim Phillips during his life time? A. Yes, sir.

"Q. Did you have occasion to see Jim some time in the early part of October, 1930, at his home? A. Yes, sir.

"Q. State to the jury whether or not you examined him, and what you found, in your own words—just to the jury? A. Well, I went in there and examined him, and he was hurt. I don't know how he got hurt, but he had a lacerated condition of his hip; the way I diagnosed his trouble he was permanently injured, and the only treatment I could give him was just liniment and massage with the hand. Really, I had known him all his life up until that time, and he wasn't afraid of work and he was very active, strong and able bodied, but after that happened he never was able to do any work, on account of the permanent injury to his hip.

"Q. What about his condition as to whether he moved or had to hop from one place to another after his injury? A. He would not carry himself good; he got a stick so he could walk and take his time to get about. Some doctors you see might call it lumbago; of course, lumbago is in the back, but that wasn't lumbago or rheumatism. This condition was a permanent laceration of the hip joints.

"Q. He was killed in an automobile accident on September 20, 1932? Did you see him from time to time until the time of his death? A. I saw him up until a few days before his death.

"Q. What was his condition, as to whether he had grown better or just the same? A. He had not grown any better; that was a permanent injury.

"Q. If he was injured as he told you when you went to see him and had not got any better until September, 1932, would you say that is a permanent injury that he received at the time he was hurt at the brick yard? A. Yes, sir; it was a permanent injury."

Appellant's theory of the case was that Jim Phillips' incapacity resulted from a disease in no way related to his injury, and it offered testimony in support of that issue; but appellant offered no testimony to the effect that Jim Phillips was not totally incapacitated.

Under the statement of the evidence, the error certified to the Supreme Court by question No. 3 was immaterial. In explanation of question No. 3, we say that the authorities cited above had not been handed down when we sent our certificate to the Supreme Court.

 Appellant has an assignment against certain testimony; this testimony was immaterial in that the issue upon which it was offered was satisfactorily established, independent of the testimony excepted to.

 We give appellant's thirteenth, fourteenth, and fifteenth propositions:

### Thirteenth Proposition

"It is improper to give a general charge in a case submitted upon special issues."

### Fourteenth Proposition

"A proper charge upon the burden of proof is a valuable one."

### Fifteenth Proposition

"It is reversible error to charge the jury to answer each issue from a preponderance of the evidence over objection that same deprives Plaintiff in Error of a negative answer to Defendant in Error's affirmative issues, if the evidence does not preponderate either way."

The following is the only statement made by appellant in support of these assignments:

"The Court's charge contains the following:

"This case is submitted to you upon special issues or questions which you will answer from the preponderance of the evidence—that is, the greater weight and degree of credible evidence before you, without reference to the effect that your answers may have upon the judgment to be rendered in this case."

The statement is insufficient to point out and support the errors assigned. Also, the propositions are too general to direct

our attention to any specific error in the court's charge.

 The judgment of the lower court is reformed by reducing it to the principal sum of $1,111.80, with interest at 6 per cent. per annum from the respective maturity dates of the weekly compensation, as stated above.

Reformed and affirmed.